IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40226
Summary Calendar
_____


STEVEN EDWARD MAYFIELD,

                                        Plaintiff-Appellant,

        versus

JACK A. ELLETT, Sheriff, Panola County,

                                        Defendant-Appellee.


_____

Appeal from the United States District Court for the
Eastern District of Texas
(6:95-CV-246)
_____

October 29, 1996
Before GARWOOD, JOLLY and DENNIS, Circuit Judges.*

GARWOOD, Circuit Judge:

        Plaintiff-appellant Steven Edward Mayfield (Mayfield), a

former inmate of the Panola County Jail (jail) now confined by the

Texas Department of Criminal Justice (TDCJ) at the Boyd Unit in

Teague, Texas, proceeding *pro se* and *in forma pauperis*, filed this

civil rights action under 42 U.S.C. § 1983 complaining of alleged

constitutional violations during his confinement in the jail.  The

_____

*       Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

only named defendant in Mayfield's action was Jack Ellett, the sheriff of Panola County, Texas. Mayfield asserted various claims regarding improper medical treatment, inadequate dietary accommodations, improper cell lighting, and inadequate outdoor recreation. Mayfield's action was referred to a magistrate judge who conducted an evidentiary hearing. At the evidentiary hearing, both the treating physician and Panola County's chief deputy in charge of the jail testified regarding Mayfield's claims. Mayfield cross-examined each witness. The parties consented to jurisdiction by the magistrate judge. After the hearing, but before final judgment was entered, the Panola County chief deputy jailor served Mayfield with an arrest warrant for perjury. Upon consideration of the pleadings and the evidence presented at the hearing, the magistrate judge dismissed with prejudice Mayfield's claims as frivolous. Mayfield sent a letter to the district court complaining about the perjury charge and requesting an injunction of the state court perjury prosecution. Before the magistrate judge ruled on the injunction, Mayfield filed his notice of appeal of the earlier dismissal. The magistrate judge subsequently denied Mayfield's request for an injunction. For the following reasons we affirm the magistrate judge's dismissal of Mayfield's civil rights action.

## Facts and Proceedings Below

On March 19, 1995, Texas Department of Public Safety (DPS)

2

officers stopped the motor home in which Mayfield was traveling for a traffic violation. Mayfield was arrested after the DPS officers and a deputy sheriff from Panola County found marihuana inside the motor home. According to Mayfield, police officers at the scene would not permit him to retrieve his spectacles, clothes, or hypertension medication which were inside a bag in the motor home. Mayfield testified that the two medications left in the motor home were Procardia (twenty milligram capsules) and Inderal (eighty milligram capsules). The officers brought Mayfield to the Panola County Jail in Carthage, Texas.

Mayfield contends that at the jail he informed the booking officers of the medication he was taking for hypertension and tuberculosis. Mayfield further contends that, in addition to the information he supplied to the booking officer regarding his need for medication and his medical condition, he made requests for medication to both John de Presca (de Presca), the chief deputy in charge of the jail, and the floor deputies. Mayfield also asserts that he placed phone calls to various citizens of Carthage requesting that they call the jail on his behalf. Although contradicted by de Presca, Mayfield claims that he requested to see a physician virtually every day until March 28, 1995, when he was finally taken to the Panola County Hospital.

At the Panola County Hospital, Mayfield provided additional medical information to a receptionist and an attending nurse. Mayfield's temperature was taken and he received an

3

electrocardiogram (EKG) test. The treating physician was Dr. Gary Wynn Swink (Swink). Dr. Swink testified that he prescribed Inderal and Adalat CC for Mayfield's heart problems and INH (Isoniazid) for Mayfield's tuberculosis. Dr. Swink testified that Adalat CC is identical to Procardia and is not a generic form; rather, according to Dr. Swink, Adalat is simply Procardia produced by a different company—in both cases the generic drug is nifedipine. Dr. Swink also testified that, although he prescribed Inderal, he gave the pharmacy permission to substitute a generic form, Propanoil, which was actually given to Mayfield. According to Mayfield, he informed Dr. Swink that he had had prior reactions to different forms of Procardia and requested the capsule form. Dr. Swink told Mayfield that there was no difference between the drugs and refused to prescribe the form of Procardia requested. Mayfield concluded that Dr. Swink's refusal to prescribe the specific form of Procardia requested was based solely on cost considerations. Mayfield was returned to the Panola County Jail where he took the prescribed medications for about a week. Mayfield testified that he stopped taking the medication when he experienced a skin reaction.

On April 10, 1995, Mayfield filed this suit against sheriff Ellett in the Eastern District of Texas alleging improper medical attention, lack of outside recreation, inadequate dietary accommodations, improper cell lighting, and the improper refusal of his request to retrieve his spectacles and clothes from his motor home when he was initially arrested. Specifically, Mayfield

4

complained that, in addition to his denial of requested medical treatment, he was forced to inhabit a cell in which a bunk light designed to "dim" during sleeping hours remained fully illuminated; was denied a special low salt/low fat diet more appropriate for his heart condition; was denied outdoor recreation because the detainees residing in the jail received sunlight only through a skylight in the indoor gymnasium; and was denied his clothing and prescription spectacles left in his motor home. The initial complaint requested only equitable relief.

On April 12, 1995, Mayfield pleaded guilty to possession of marihuana and was sentenced to five years' imprisonment.

On April 19, 1995, de Presca ordered Mayfield to be placed in isolation for medical reasons. At the time of his isolation, Mayfield had some form of skin rash. Mayfield remained in isolation until May 1, 1995. On April 20, 1995, a Panola County deputy again took Mayfield to the Panola County Hospital. Mayfield informed the nurse that the medication prescribed by Dr. Swink on March 28, 1995, had caused a severe skin reaction. Mayfield left the hospital before he could be seen by Dr. Swink because the deputy escorting him was called away.

On April 24, 1995, a letter from Mayfield dated April 19, 1995, was received by the Eastern District of Texas and assigned to the magistrate judge responsible for his complaint. The letter complained of the skin reaction and the magistrate judge construed it as a motion for preliminary injunctive relief seeking medical

5

treatment.

On April 25, 1995, Mayfield again visited the Panola County Hospital and was seen by Dr. Swink. Mayfield told Dr. Swink that he had awakened to blood in his mouth and eye and that his right cheek was swollen. The nurse, however, found no swelling in that area. Mayfield told the nurse that he had noticed white spots on his skin after he began taking the Adalat and the Propanoil and therefore had stopped taking the medication three weeks earlier. Dr. Swink testified that he overheard Mayfield's conversation with the nurse and called the jail to get Mayfield's medication records, which indicated that Mayfield had refused medication for only two days. According to Dr. Swink, when confronted with the discrepancy between Mayfield's earlier contention that he had stopped taking the medicine three weeks prior to his visit and the medication records, Mayfield became argumentative and was excused from the emergency room. Dr. Swink testified that he directed Mayfield to continue to take the prescribed medication. At the time of Mayfield's third visit to the hospital, Dr. Swink observed no physical side effects on Mayfield's person.

On May 4, 1995, Mayfield was transferred to the custody of the TDCJ. While in the custody of the TDCJ, Mayfield has been prescribed Nitroglycerine, Metro PR, Lasix, Fosinopril, and Prazosin. Mayfield's blood pressure has remained high throughout his custody. Also on May 4, the magistrate judge recommended denial of Mayfield's motion for preliminary injunctive relief.

6

On June 15, 1995, the district court adopted the magistrate judge's recommendation to dismiss Mayfield's motion for preliminary injunctive relief on the grounds that, as Mayfield was no longer in the Panola County Jail, his request for preliminary injunctive relief was moot.

On August 8, 1995, the magistrate judge recommended dismissal of Mayfield's civil rights action, which also sought solely equitable and injunctive relief, on the grounds that Mayfield's transfer to the TDCJ rendered his action moot. Mayfield thereafter added a claim for damages in his objections to the magistrate judge's recommendation on August 18, 1995. Mayfield's supplemental complaint sought $1 million compensatory damages and $1 million punitive damages.

As a result of Mayfield's new damage claims, the magistrate judge withdrew the recommendation for dismissal on October 10, 1995.

A hearing under *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), was held before the magistrate judge on January 24, 1996, at which Mayfield, Dr. Swink, and Chief Deputy de Presca testified. At the *Spears* hearing, the parties consented to jurisdiction by the magistrate judge.

On February 5, 1996, a letter from Mayfield was received by the Eastern District of Texas requesting an injunction of a pending state perjury prosecution brought by Deputy Sheriff de Presca

allegedly in retaliation for Mayfield's civil rights complaint.

On February 6, 1996, the magistrate judge dismissed with prejudice Mayfield's civil rights action on the grounds that the claims were frivolous. In making her decision, the magistrate judge construed all testimony given by Mayfield as true and considered all other testimony only to the extent it did not contradict that given by Mayfield.

On February 12, 1996, Mayfield filed a complaint seeking the injunctive relief requested in his letter received by the district court on February 5, 1996.

On February 20, 1996, Mayfield filed a notice of appeal of the magistrate judge's dismissal of his civil rights action.

On February 21, 1996, the magistrate judge denied Mayfield's request for injunctive relief.

Before this Court is Mayfield's appeal from the magistrate judge's dismissal of his civil rights complaint.

## Discussion

An *in forma pauperis* complaint is subject to dismissal as frivolous if it is unsupportable in law or fact. *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994) (citing *Denton v. Hernandez*, 112 S.Ct. 1728, 1733 (1992)). Such a dismissal is reviewed under the abuse of discretion standard. *Id.*

As a threshold matter, we recognize that the events and circumstances that Mayfield asserts violate his constitutional

8

rights largely occurred during the period he resided at the jail as a pretrial detainee. From his initial arrest and incarceration at the jail on March 19, 1995, until his guilty plea and conviction on April 12, 1995, Mayfield was a pretrial detainee rather than a convicted inmate.

The Panola County Jail houses both pretrial detainees and convicted prisoners awaiting transfer to the TDCJ. We have long recognized, however, that each group "look[s] to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Estelle v. Gamble*, 97 S.Ct. 285, 291 (1976)). Whereas convicted state prisoners are protected by the Eighth Amendment's prohibition on cruel and unusual punishment and, to a limited degree, substantive due process, pretrial detainees are protected by the "procedural and substantive due process guarantees of the Fourteenth Amendment." *Id.* Accordingly, conditions of confinement may "constitute deprivations of liberty without due process if they amount to punishment of the detainee." *Harris v. Angelina County*, 31 F.3d 331, 334 (5th Cir. 1994); *see also Hare*, 74 F.3d at 639 ("The State cannot punish a pretrial detainee.") (citing *Bell v. Wolfish*, 99 S.Ct. 1861, 1872 (1979)). A proper determination of whether a condition of confinement of a pretrial detainee amounts to punishment "turns on whether 'the disability is imposed for the

purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Harris*, 31 F.3d at 334 (quoting *Bell*, 99 S.Ct. at 1873); *see also Bell*, 99 S.Ct. at 1874 ("Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"). Given the heightened due process protection afforded pretrial detainees, it is apparent that confinement conditions violative of the Eighth Amendment are assuredly violative of a pretrial detainee's due process rights as well. *See Hare*, 74 F.3d at 639; *Harris*, 31 F.3d at 334.

When a pretrial detainee challenges "general conditions, practices, rules, or restrictions of pretrial confinement," the *Bell* test applies——the challenged policy or condition must be reasonably related to a legitimate governmental interest, such as security. *Hare*, 74 F.3d at 643. When, however, a pretrial detainee challenges a jailor's "episodic acts or omissions, the *Bell* test is inapplicable, and hence the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Id.* (adopting a standard of subjective deliberate indifference as the measure of culpability for episodic acts or omissions).

We note, as did the magistrate judge, that Mayfield named only sheriff Jack Ellett in his complaint; no other members of the

sheriff's staff were added and no amended complaint was filed. Section 1983, of course, does not support *respondeat superior* liability. *Monell v. Department of Social Svcs.*, 98 S.Ct. 2018, 2036-38 (1978); *Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994); *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir.), *cert. denied*, 113 S.Ct. 2443 (1993); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). Without a showing that Sheriff Ellett participated personally in the allegedly unconstitutional treatment, his liability—deriving solely from his capacity as Panola County's elected sheriff—requires a finding that he established or implemented a policy that was itself a repudiation of constitutional rights and was the "'moving force of the constitutional violation.'" *Thompkins*, 828 F.2d at 304 (quoting *Monell*, 98 S.Ct. at 2037). The same is true insofar as Ellett was sued in his official capacity, that is insofar as the suit may be regarded as one against the county. *Id*. Mayfield concedes that he spoke with sheriff Ellett only once, after the filing of his action. Mayfield also conceded that his complaint (at least as respects claimed inadequate medical attention) centers on the actions of others.

I. Inadequate Medical Attention

In order to prevail on his inadequate medical attention claim, Mayfield must either establish that there was a condition, practice, rule, or restriction that prevented adequate medical

11

care, *Hare*, 74 F.3d at 643, or that an episodic act or omission resulted from the defendant's "deliberate indifference," *id.* As Mayfield neither asserts nor offers evidence of such a condition, practice, rule, or restriction, and, in fact, acknowledges that the jail had a system designed to gather medical information, alert officers to the need for medical attention, and provide for free, accessible medical services and medication, his claim for inadequate medical attention rests entirely on his ability to establish deliberate indifference on the part of the defendant sheriff Ellett.

As this Court instructed in *Hare*, for challenges to episodic acts or omissions of jail officials that resulted in inadequate medical attention, the *Farmer* standard of deliberate indifference applies. *Hare*, 74 F.3d at 643. *Farmer* held:

> "[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 114 S.Ct. 1970, 1979 (1994); *see also Reeves*, 27 F.3d at 176 (applying *Farmer* standard to an inadequate medical attention claim).

Under this standard, neither "[u]nsuccessful medical treatment" nor "'[m]ere negligence, neglect or medical malpractice'" gives rise to a section 1983 cause of action. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (citations omitted). We have stated that delay in medical care can only constitute a cognizable section 1983 claim

12

if the delay in treatment results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) (addressing the issue in the Eighth Amendment context).

In light of the foregoing principles, we find no merit in Mayfield's inadequate medical attention claim and affirm the magistrate judge's dismissal. First, assuming as true Mayfield's contention that he suffered a nine-day delay in receiving medical attention, he offered no evidence that it was the delay—rather than some other factor such as stress, age, or the normal vicissitudes of life in a detention facility—that caused his condition to worsen. Second, Mayfield has failed to establish that he has suffered substantial harm from the purported delay. Instead, Mayfield's argument is directed more at the *course of treatment* rather than the *delay* in receiving medical attention. On three separate occasions Mayfield was taken to the Panola County Hospital. On two of those visits, he was examined by the attending physician, Dr. Swink. Dr. Swink presented uncontroverted testimony that he prescribed medication that he believed to be in the best interest of Mayfield's health. Although Mayfield contends that the medication provided was "wrong," such an assertion, even if true, does not affect the merits of his section 1983 claim. And, we note that Mayfield himself discontinued his medication and refused to follow the medical course of treatment prescribed by his physician. Finally, there is no evidence tending to establish the necessary

13

connection to Ellett (or the county) in respect to the matters complained of, as required by *Tomkins* as discussed above; *respondeat superior* simply does not suffice. Accordingly, we find that the magistrate judge was well within her discretion to dismiss the inadequate medical attention claim.

II. Outdoor Recreation

Mayfield's second claim asserts that the failure of the Panola County Jail to offer pretrial detainees outdoor recreation amounts to an unconstitutional punishment. Presumably, Mayfield relies on the statement in this Court's opinion in *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977), that:

> "We find that the continuous incarceration of presumably innocent persons in an institution designed to punish, where outdoor recreation is reasonably possible, is unnecessarily restrictive and therefore punishes the innocent in violation of procedural due process." *Id.* at 750.

From the outset, we note that the facts presented in *Miller* are starkly different from the facts here presented. First, *Miller* was a "totality-of-conditions" case involving shockingly inhumane overall conditions that warranted general, systemic remedies beyond the redress of specific constitutional violations. *See id.* at 745, 751. Second, *Miller* was decided before *Bell*, 99 S.Ct 1861, and its broad characterization of the right to outdoor recreation would seem, at the very least, to be tempered by the Supreme Court's articulation of the standard for evaluating the constitutionality

14

of pretrial confinement conditions.[1]

In assessing the merit of Mayfield's claim that he was denied outdoor exercise in contravention of his constitutional rights, we must return to the guiding principles set forth in *Bell*. More than anything else, *Bell* warned that, when "determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," *Bell*, 99 S.Ct. at 1875 & n.23, federal courts should weigh heavily the axiom that "'[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters,'" *id*. (citation omitted). *Bell* went on to consider

---

[1]    The panel opinion in *Jones v. Diamond*, 594 F.2d 997, 1013 (5th Cir. 1979), *vacated on reh'g*, 636 F.2d 1364 (5th Cir.) (en banc), *cert. dismissed*, 102 S.Ct. 27 (1981), noting that *Miller* stated that pretrial detainees "may not be continuously incarcerated in an institution designed to punish, where outdoor recreation is reasonably possible," held that "[t]his does not reach so far as to hold that every pretrial detainee in every jail is automatically entitled as a matter of constitutional right to outdoor exercise." On rehearing, the en banc court was evenly divided on the issue, resulting in an affirmance of the district court's denial of relief. *Jones*, 636 F.2d at 1376. In *Green v. Ferrell*, however, we reversed a magistrate judge's injunction requiring a jail to provide outdoor exercise in the absence of specific findings of medical harm, 801 F.2d 765, 771-72 (5th Cir. 1986) (noting that pretrial detainees in the detention facility, who were included in the plaintiff class, spent, on average, only ten days in the jail).

15

several factors in evaluating the restrictions there at issue. First, the Court observed that nearly all of the detainees were released within sixty days of their incarceration. *Id.* at 1876. Second, the Court stated that, although pretrial detainees retain certain constitutional rights, these rights were subject to restrictions and limitations. *Id.* at 1877. Third, the Court observed that "maintaining institutional security and preserving internal order and discipline" may require circumscription of the retained constitutional rights of convicted prisoners and pretrial detainees alike. *Id.* at 1878 (noting that there "is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order."); *see also Block v. Rutherford*, 104 S.Ct. 3227, 3231 (1984) ("The very fact of nonrelease pending trial thus is a significant factor bearing on the security measures that are imperative to proper administration of a detention facility.").

In light of the factors considered, *Bell* proceeded to uphold the federal detention facility's "publisher only" rule regarding the permissible receipt of reading materials, *id.* at 1881; the restriction limiting the receipt of personal packages to food items at Christmas, *id.* at 1882; the facility's "shakedown" procedures prohibiting inmates from observing cell searches, *id.* at 1883-84; and, finally, the facility's strip search procedures requiring body

16

cavity searches after each contact visit, *id.* at 1884-85. The Court held that the restrictions imposed were of limited duration and that the complainants failed to meet their "heavy burden of showing that the[] officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices." *Id.* at 1886.

Mayfield testified that, although he was permitted regular access to the dayroom and the jail gymnasium, he was never afforded outdoor recreation. Mayfield concedes that the gymnasium had a frosted skylight, but argues, without any indication of supporting evidence, that this was inadequate. Chief Deputy de Presca testified that the Panola County Jail has no outdoor recreation facility and that the skylight was installed in the gymnasium in 1985 to meet the state requirement that inmates be given access to sunlight. De Presca further testified that inmates, including Mayfield, were given access to the gymnasium at least three times weekly, at least one hour at a time. Mayfield did not dispute this.

Given the physical constraints of the Panola County Jail facility, we are convinced that the facts alleged by Mayfield would not even arguably suffice to sustain a finding that he was unconstitutionally punished within the meaning of the Fourteenth Amendment. As *Bell* recognized that ensuring security and order at detention facilities is a permissible nonpunitive objective, we

17

cannot say that the scheme employed at the Panola County Jail facility does not strike a permissible balance between meeting that permissible objective and affording inmates needed recreation and sunlight to the extent reasonably—and practically—available.[2] *See Block v. Rutherford*, 104 S.Ct. at 3234 (stating that a federal court's "balancing" of a detention facility's security measures against the importance of family visits resulted in impermissible substitution of the court's views regarding prison administration). Whatever remains of the general language set forth in *Miller* after *Bell* and *Green*, we are quite certain that it does not confer a constitutional right to exercise in *unfiltered* sunlight in an otherwise acceptable custodial facility regardless of the facility's physical constraints. To hold otherwise would fly in the face of *Bell*'s admonition against becoming enmeshed in the minutiae of prison operations.

Accordingly, we hold that the magistrate judge did not abuse her discretion by dismissing Mayfield's claim regarding inadequate outdoor recreation as frivolous.

III. Inadequate Diet Accommodations

In his initial complaint, Mayfield asserted that the Panola County Jail violated his constitutional rights by denying him a

---

[2] We also note that Mayfield did not testify or adduce any evidence that he ever requested outdoor exercise. In addition, Mayfield's heart condition, provided it was as serious as claimed, may well have precluded any exercise during his stay at the Panola County Jail.

special diet.  In his brief, Mayfield does not elaborate on his position other than to assert that he requested a special diet. The magistrate judge's opinion concluded that Mayfield was not entitled to a special diet because his treating physician determined that it was not medically necessary, citing *Cupit v. Jones*, 835 F.2d 82, 86 (5th Cir. 1987).  Mayfield has failed to adequately raise any issue on appeal in this respect. *See Lott v. Hargett*, 80 F.3d 161, 166 (5th Cir. 1996); *R.A.M. Al-Ra'id v. Ingle*, 69 F.3d 28, 31 (5th Cir. 1995); *Brinkman v. Dallas County Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987).

IV.  Injunction of the State Perjury Prosecution

Mayfield argues that the magistrate judge abused her discretion by her denial of his motion for an injunction of the state court perjury prosecution.  The issue, however, is not before the Court and we therefore decline to address Mayfield's contention.

A timely notice of appeal is a jurisdictional prerequisite for this Court to consider an appeal. *See Robbins v. Maggio*, 750 F.2d 405, 408 (5th Cir. 1985) (citing Fed. R. App. P. 4(a)).  Mayfield's notice of appeal is dated February 16, 1996, and was filed on February 20, 1996.  It has never been amended.  Mayfield has filed no other notice of appeal.  The February 16, 1996, notice of appeal, filed February 20, refers exclusively to the magistrate judge's February 6, 1996, denial of Mayfield's civil rights action.

19

The magistrate judge's order denying Mayfield's request for injunctive relief was filed and entered on the docket on February 21, 1996.

This Court therefore lacks jurisdiction to consider the propriety of the magistrate judge's order denying injunctive relief as to the state perjury prosecution.[3]

V. Other claims

Mayfield does not appeal, and we do not address, the magistrate judge's dismissal of his claims regarding his cell lighting, his spectacles, and his clothing.

## Conclusion

Because the magistrate judge was well within her discretion to dismiss Mayfield's civil rights action as frivolous, and because the denial of Mayfield's motion for injunctive relief is not before this Court, we AFFIRM.

---

[3] Although a "'notice of appeal typically divests the district court of jurisdiction,'" *Resolution Trust Co. v. Smith*, 53 F.3d 72, 76 (5th Cir. 1995), (quoting *Alberti v. Klevenhagen*, 46 F.3d 1347, 1358 (5th Cir. 1995)), a "'district court maintains jurisdiction as to matters not involved in the appeal.'" *id.* (quoting *Farmhand, Inc. v. Anel Eng'g Indus.*, 693 F.2d 1140, 1145 (5th Cir. 1982)). Accordingly, as Mayfield's notice of appeal was filed before the magistrate judge's denial of his motion for injunctive relief, it failed to divest the magistrate judge of jurisdiction of that matter.